Good morning. May it please the court, my name is Gia Kim, appearing on behalf of Appellant Mary Lim, and I'd like to reserve five minutes for rebuttal. In its opening argument in this Medicare fraud trial, the government stated that this was a document case, and it promised the jury a pile of documents that would prove that Ms. Lim and her co-defendant, Dr. Pak, quote, submitted claims for things that weren't done. And indeed, there was evidence that, there was testimony that certain claims were paid, and there was evidence that certain things weren't done. But the evidence was insufficient for conviction because there was nothing connecting those two universes of evidence. There was nothing connecting ten specific charged claims in the trial exhibits, which consisted of patient files and business records. Well, the government conceded that there's insufficient evidence on certain of the counts, correct? Yes. And so, I mean, we're obviously not required to accept that concession, but by the same token, obviously, I think your time can possibly be better spent on, is it nine and ten? Sure, Your Honor. On the ones that they're claiming that, they're conceding that there was error, and that the error was such that it would require reversal, but they want to retry them, saying that, so that jeopardy doesn't attach. And so, you're essentially, what, arguing that there was, it's an insufficiency of the evidence reversal, and therefore, they can't retry it, right? Yes, Your Honor. Yes. So, let me focus on counts nine and ten. However, I believe that the logic of why the evidence was that the patient in counts nine and ten, Ms. Chu, was different, because she never saw the doctor, is something of a red herring. The, looking at the specific evidence. So, on the one hand, you have the claim is charged in the indictment, count nine. There's a 15-digit, what we know about that claim, there's hearsay testimony that it was paid by the safeguard investigator, Salazar. There's a claim number, it's a 15-digit number, ending in 9710. It's claimed 551 trillion something. That claim number appears nowhere in the patient files and nowhere in the business records. The second piece of information we have is the approximate submission date, which in the indictment is relevant, perhaps for statute of limitation purposes, but that submission date of any claim appears nowhere in the patient file, any patient file, or in the business records. The third piece of information is that Medicare paid $54.21. Again, there's no remittance notice or check for 54, or, you know, indication of receipt of that amount anywhere in the patient files or the business records. Was there any testimony or any evidence at all in the record about how long it would normally take between when a patient would have their visit versus when the claim was submitted? No, Your Honor. And in fact, this particular patient, Soon Ok Choo, or Ok Soon Choo, she's referred both ways, she went to the Fern Street Clinic between August 2007 and June 2008. This claim was submitted as charged in the indictment October 11, 2008, so more than four months after her last recorded visit there, and there was no testimony saying, yes, it usually took four months or four weeks or anything, it was submitted on the same day. The other question I had along the same lines was, I thought I saw on the record that the clinic was closed in October of 2008? The clinic was put on prepayment review in October of 2008. I believe that may have, it's unclear whether that was before or after October 11. Definitely by December 2008, it was closed. That's when Ms. Lim called the investigator and said, you know, it was closed and my employment has been terminated, and I don't think there's evidence of any claims after that date. Now, you argue that I think claims 9 and 10 weren't proven false because Lim and Dr. Pack told the safeguard investigator that Lim was hired as a physical therapist, but couldn't the jury, since there was a jury, you know, that we have to give all inferences in favor, find those statements not credible and to infer that Lim wasn't a physical therapist based on all the evidence suggesting that no physical therapy took place at the clinic? Your Honor, so what we've been discussing up to now is why the evidence would be sufficient for any of the counts, but particularly as to count 9, claims specific, count specific evidence, you know, certainly I don't think there was any other information negating the fact that she was hired as a physical therapist, and I think maybe more to the point, at least for count 9, that count as charged in the indictment involved a CPT code 99213, and that was for an office, it says in the indictment it was for office visit of established patient. Kathy Montoya, the Medicare expert who worked at Palmetto, one of the two or three contractors who were involved in this case, or involved in the processing and auditing of Medicare claims, never testified about what's required under 99213. It appears that certain Medicare or CPT codes require face-to-face. Others, like the two physical therapy codes that are used a lot, 97110, 97140, can be performed by a physical therapist or physical therapy assistant, but the doctor still has to sign off. Kathy Montoya said at ER 199, when services are provided by a physical therapist or physical therapy assistant, incident to a physician who has a provider number, the physician must sign off on that, but there was no testimony as to 99213, whether the physician for an office, if the patient comes in for an office visit and is getting physical therapy from this physical therapist or physical therapy assistant who is not a physician, whether the doctor has to see her face-to-face or just be in the same office suite. The testimony of Kathy Montoya was that for these incident to services, the doctor has to be on site but not in the same room. And that would be for 97110, 97140, and G0283? There was no testimony about the G code at all, or the 99213, the one in Count 9. There was testimony that the other two, 97110 and 97140, could be provided if by a physical therapist or physical therapy assistant. You're getting close to the slide, but do you want to just hear what the government has to say and then you have plenty of time to respond? I think that's a great idea. I do have one quick question for you. When did the government inform you it was going to be taking the position that the counts in this case were invalid, either forever or at least temporarily? The government informed me that they were likely to concede error on some counts at, I'm not sure of the precise date, but when it was requesting an extension on their answering brief. But they also, too, there was a co-defendant that was tried with your client, right? Yes, Your Honor. And that person, while you made the rule at the end of the case and that was denied by the judge, apparently the other co-defendant took another route and made a motion after trial and the judge set aside, that was a different count, but still there was, and then... Yes, the co-defendant who was charged only with the... Count 13, I think it was. Yes, Count 13, the Section 1035 false statement in relation to health care count was granted a new trial on the basis of instructional error. Ninth Circuit had this case at JOKU and... So that retrial set for April or something like that? Yes, Your Honor, I believe so. But isn't, I mean, the bottom line about the retrial is all about $1.4 million in restitution, it seems like. I would imagine that is the case, yes, Your Honor. Okay, thank you. Thank you. Good morning, Your Honors. Kristen Williams, United States. Good morning. As noted on the appellant's arguments, this is really a narrow issue. It's just about two counts, 9 and 10, and whether there was sufficient evidence just to warrant a retrial on those two counts. I've explained in my answering brief why we believe there is sufficient evidence, and we've gone into that with respect to the testimony from Soon Chu herself about never seeing a doctor, never receiving... How do we... I'm sorry. We have three prior prosecutors on this panel that are having a hard time understanding, in this particular case, what the prosecutor was doing here. You know, I mean, one of the things that you're for as a prosecutor is that you list the elements of the offense that you have to prove, and you know that there's something called double jeopardy and that you don't rest without doing certain things, and a prosecutor's job is very much tied to the ability to introduce documents, and this is a document case. I agree, Your Honor, and this is part of the reason why we have conceded counts 1 through 8. There were certainly things that could have been done better in this. There were the claims data. I think that's an understatement. The introduction of the claims data would have solved, obviously, a lot of problems. I don't think, however, that that is fatal on counts 9 and 10, given the testimony of the beneficiary there and the hearsay testimony, which is why we're in the retrial versus an affirmance of George Salazar, and I think that's worth... Can I jump in? The question I had just is the most basic one, because you identified the testimony of Soon Chiu. Yes. How did the jury know that that person was the same person named in counts 9 and 10? I believe Your Honor is referring to the arguments that were raised in the reply brief, these sort of jury confusion arguments, and I think... I'm just talking about from a sufficiency standpoint. How could a rational jury, presented with the evidence that was here, connect the claims that are referenced in the 9 and 10 SC to the person who actually came in and testified live in court? Well, connecting SC to Soon Chiu, I think, is one issue, right? And I think there is sufficient evidence in the record that she was the only beneficiary who testified with those initials. She is the only patient filed with those initials that was admitted into and reviewed in the course of the trial. And with respect to the connection between the count and the claim, I think that goes to what I was trying to get up to a moment ago, which is the hearsay testimony of George Salazar. I'm just still trying to figure out, well, why? I mean, there could have been a lot of people seen at that clinic with those initials. How was the jury supposed to know, beyond a reasonable doubt, that it was the person who they saw walk into the courtroom? And, again, with respect to that, George Salazar testified that he looked at the indictment, looked at the claims, and that the claims for those indictments, for those particular counts, were paid. And so the reason that's hearsay is because he was relying on the claims data that has the very content of information... I'm not even talking about the point you're talking about. I'm talking about a point that's sort of even more basic than that. Do you hear what I'm saying? There could have been 50 people with the initials SC seen at that clinic for all the jury knew, and one person comes in, and you're relying on that person's testimony to distinguish counts 9 and 10 from the others. And I'm just saying, what did the jury have to draw the inference that, oh, the person that is identified by initials SC that Mr. Salazar testified about, those claims correspond to the patient that we saw come in. Well, again, I think with respect to the SC versus Sun Qu, I would go back again to this was the... Isn't your argument that the indictment says SC, her name is Sun Qu, and she was the only one that testified, and so the question is can a jury infer from that, is that enough? There's nothing more than that, right? To tie SC to Sun Qu. The initials for Sun Qu are SC, and the indictment said SC. That's correct, and I think, Your Honor, it's misplaced to rely so much on how she's identified in the indictment, because if that were the case, then the whole argument would turn on whether the indictment went back to the jury or didn't go back to the jury, and I don't think that's the inquiry in a sufficiency of evidence claim. The inquiry is here's the charge, here are the elements, is there some evidence in this stew pot of evidence that was presented that would match? So what do you have to connect the two? I mean this person could have just been some random individual that had nothing to do with any of the counts charged, and I guess I did look quite hard to see what, I mean even could you have asked Ms. Chu, for example, I don't know, did you go and get seen on this date, did you, something so that the jury could say, oh yeah, this person that we just heard from corresponds to the person whose claims are identified in these two counts. And, Your Honor, I can't answer the question as to why the prosecutors didn't ask that particular question of Sun Qu, but I don't think it's required, and again I'm going to go back, again I don't want to belabor the point, but to George Salazar. George Salazar is looking at a count in an indictment with SC. He then matches that with claims data for Sun Qu with the claim number and so forth. So the jury is relying on that connection, which is made, albeit through hearsay, by George Salazar. He did not testify that this is Sun Qu for count 9, did he? He did not. He testified that the counts in there for SC had been submitted. So what if it was actually Steve Clymer, the former criminal chief in Los Angeles? Let's say he was the one, he was really the SC for this claim, for claim 9 it was Steve Clymer. And, well, I think that would have been a real stretch for the jury to have inferred that, given that Steve Clymer didn't testify at trial. But I guess, to get back to Judge Watford's point, is that what is the connection if there's no information that she can provide that she was claim 551180828, it could have been Steve Clymer, it could be Sonny and Sharon, it could be a lot of people with the initials of SC. And, I mean, from what I'm hearing is you're saying we agree that there was evidence that the claim was paid. We got you there. And there was evidence that this woman came and testified saying, I didn't see a doctor. What's the connection between her and count 9? Well, I think I would go back to Judge Calatay's point from a moment ago that that's the only person that was there. We had beneficiaries testify. Well, how did they argue the case to the jury? They argued it in closing argument using a count, summary count chart, which connected by name to count. Granted, that's not evidence, but I think it does go to the lack of jury confusion. And even if jury confusion was the issue as to how do we match this up, the remedy would be retrial, which is what we're asking. Well, it's not a matter of confusion. It's a matter of whether a rational jury could draw the inference that obviously your colleagues wanted them to. And other than you basically just saying, well, the jury should just kind of take the government's word that, well, we wouldn't have brought in some random person if they didn't have some connection to the counts we charged. Other than just trust us, we've got the right person. I don't hear you saying that there was something else, some piece of evidence the jury could rely on to connect the two. I mean, again, I'm going to go back to the testimony of that, the patient file that was admitted on behalf of S.C. Soon-Chu and the connection between that, the Salazar testimony, with respect to the actual content of the claim. That's the hearsay. Let's go back to the Salazar testimony because I did not read all of it. But the part I remember that seemed critical was just, it was like two lines. He was asked, so did you check these claims to see if they were paid? And he said, yeah, I did. Is there something else in there where he said he was presented with Soon-Chu's claims file and said something like, yeah, and the claims that relate to this patient here, those are the ones I checked and those were paid? Is there something more specific that you're talking about? No, I don't believe so, Your Honor. I think what you've got is the content of the claims that are underlying his statement that the claims that were charged in the counts were submitted and paid. What should we make of the fact that I think Soon-Chu's last recorded visit to the clinic was June of 2008, but Counts 9 and 10 discussed claims submitted on October of 2008? Well, there's a difference, I think, Your Honor, between a submission date and a date of service. And so I think to go to the... So is that in the record, that her last visit was in June of 2008, and is it in the record by virtue of hearsay, or is it the indictment that says it was submitted October 2008, or what's in the record? What's in the record is you have her patient file, which covers the specific dates of treatment there, going up through, I believe, either June or July of 2008. And then you have, again, George Salazar relying on the content of the claim. The content of the claim, incidentally, has the date of submission, and it would also have the date of treatment. So both of those... So is there anywhere in the record that it was submitted in October of 2008? Again, that would be through the hearsay that George Salazar was relying on. But you would agree with Ms. Kim, though, that there's no evidence explaining that when someone sees a doctor in June, it takes four months for the claim to be processed? I don't believe that there's anything in the record specifically explaining that delay. And I'm happy to address some of the other issues. Well, is this kind of all about the... Is there that song, It's All About the Bass? Is this kind of all about the restitution? No, Your Honor. Actually, the government does intend to go for retrial, and I think there's a couple of reasons why. Obviously, she has served a good amount of her sentence, so it's not really the punishment that is at issue. Well, and she kept it. It took a long time to figure that out. She was in custody for a long time while this was pending, right? There were many extensions requested before the initial brief was filed, the appellant's opening brief. Once the government looked at the case, realized what the arguments were, that it was going to have to concede, it notified the defense in the context of asking for a short extension in order to reply. The government then worked with the defense or the appellant to get her released. She is not currently in custody. She has been released. Her appeal has been expedited so that this issue can be addressed to determine whether a retrial is there. The government would intend to seek that retrial because the importance in this case is not just the restitution. It's a deterrent effect. There's clearly evidence of an extensive fraud scheme here. Were there mistakes made in the linkages of certain counts? The government has conceded there were fatal linkages with respect to counts 1 through 8. But what we're asking for is a chance... Were there two people that tried this case together? Yes, Your Honor. So, two people? Like, had insufficient evidence on counts 1 through 8? That is what... And again, I don't want to get into the inner workings of the U.S. Attorney's Office here, but the plan really is if we were to agree with you and send this back for counts 9 and 10, you're saying in court today you would actually want to retry this case with a witness who's... How old is she now? 90? 88? As the key to saving this case? I believe the testimony was that she was 83 at the time of the trial, and so that would be... She'd be 85 now. And by the time the trial happens, probably 86 or so. I'm just wondering, again, this is your guy's call. I just want to make sure you said there was intent to retry, and this is... That is the plan. That is our intent. And, I mean, as someone who frequently tries health care fraud trials, we are often dealing with elderly beneficiaries by virtue of the fact that it's the Medicare program. So that is not in itself particularly unusual in a health care fraud trial. We think that the deterrent interests are important here, both against other people who have similar clinics. There was testimony in trial that this is not a particularly uncommon scheme. It came out of an investigation in the Biller with lots of similar physical therapy clinics. So there are lots of other interests beyond simply the restitution. As someone who routinely tries these cases, and I know you didn't try this one, as a former prosecutor I was surprised there was no 371 or 1349 charge, which I think we would not be here. I think Ms. Kimby would be making a very different argument if those were the charges that were brought, and they weren't. Is that standard practice in your office not to bring a conspiracy charge? I can speak more to my own practice than sort of globally, but the view typically is that the 1349 is coextensive with a scheme. A scheme and a conspiracy don't get you in too far of a different place. Perhaps you'd be in a slightly different place given the particularities of this particular case, but that's something that you would never anticipate. When I charged this case, I didn't anticipate that I would be at this particular juncture. But, again, I would go back to I think there is sufficient evidence. I grant that it is at the threshold of whether or not it's sufficient, but I think it is sufficient when you look at what's underlying George Salazar's testimony there. That hearsay is relying on the very content of the claims that the defense is so often talking about not being there. And I think the connection issue is more of a jury confusion issue that more goes to a retrial versus an affirmance. And for those reasons, I would submit. Thank you. Thank you, Campbell. Thank you. I'd just like to make a couple points. First, the claim codes charged here, if you look at ER 1317, there was $54,000 paid. There's testimony that there's $54,000 paid on that code 99213. At $54 a pop, just for Dr. Pak alone, that's 1,000 claims under that code. For the other codes, there was evidence that there was $1.1 million in billing on those claims. And at $100 a reimbursement, that's, I believe, 10,000 claims submitted under those codes. And there was a lot of evidence about how there were 62,000 line items for Dr. Pak. And I believe, for the reasons this Court has articulated, that it's impossible to say that this SC was that particular one out of 62,000. And I don't think there's even sufficient evidence to show that this claim was underdone. Was there anyone else at the trial that testified that had the initial Zessi? No, Your Honor, there wasn't. And when they argued it, did they argue it as to count nine? They argued that it was a patient. They actually pointed to Exhibit 26, which was not Soon-Chu. That was Myung-Hee Ra. So Soon-Chu's patient file was actually Exhibit 27. I don't know what the counts chart said, but in closing argument, they did not give a name. And they said this patient, whose file was Exhibit 26, which was the incorrect chart. And just as a final point, Soon-Chu's testimony obviously did not establish this link. She could not establish this link. She didn't even remember giving her Medicare card to the clinic. I believe she is 87 or 88 at this point. But there was a much easier way, not going through the testimony of a beneficiary who doesn't know the particular niceties of Medicare billing, which was simply just to introduce the claims or the remittance notices or the claims data or some derivative of that information. Was there any testimony as to how many patients all told were seen at this clinic? No, Your Honor. What we have is 62,000 line items, but that could obviously be multiple for each patient. And I believe there was testimony that the defendants collectively produced 400 or 500 files. And we know some of those were missing. So of the 28, they didn't get all of those 28 that were initially audited. So I think one could infer that that was not all of the patients that had ever been seen, but some subset. So the number was north of 500 is what you're saying? I believe it was 4 or 500. Two years after the clinic had closed, the defendants produced patient files pursuant to subpoena, and they were in the 4 or 500 range. Okay. Thank you. Thank you both for your argument in this matter. This will stand submitted.
judges: Callahan, Watford, Owens